Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Anupama K. Reddy (SBN 324873)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email:   jsaveri@saverilawfirm.com
         swillliams@saverilawfirm.com
         areddy@saverilawfirm.com

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CANDIE FRAZIER**, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> **BYTEDANCE INC. and TIKTOK INC.** <br><br> *Defendants*. | Civil Action No. 2:21-cv-9913 <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> CLASS ACTION |

Plaintiff Candie Frazier, on behalf of herself and all others similarly situated, brings this Class Action Complaint against Defendants ByteDance Inc. and TikTok Inc. ("Defendants") for negligence, negligent exercise of retained control, and violations of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, UCL §17200, demanding a trial by jury on all claims for which a jury is authorized. Plaintiff Frazier makes the following allegations based on personal knowledge as to the facts pertaining to herself and upon information and belief, including the investigation of counsel, as to all other matters.

## INTRODUCTION

1. Plaintiff Candie Frazier is a content moderator who seeks to protect herself and all others similarly situated from the dangers of psychological trauma resulting from exposure to graphic and objectionable content on ByteDance, Inc.'s (ByteDance) TikTok application ("app") and ByteDance's failure to provide a safe workplace for the thousands of contractors who are entrusted to provide the safest possible environment for TikTok users.

2. Every day, TikTok users upload millions of videos to its platform. Millions of these uploads include graphic and objectionable content such as child sexual abuse, rape, torture, bestiality, beheadings, suicide, and murder. To maintain a sanitized platform, maximize its already vast profits, and cultivate its public image, TikTok relies on people like Plaintiff Frazier—known as "Content Moderators"—to view those videos and remove any that violate the corporation's terms of use.

3. Plaintiff works for the firm Telus International ("Telus"), which provides Content Moderators for TikTok, a popular app owned by ByteDance. ByteDance is an important client of Telus International.  TikTok is a social media application that allows users to create and share short videos that can be edited with background music and other special effects

4. While working at the direction of ByteDance and TikTok, Content Moderators—including Plaintiff Frazier—witness thousands of acts of extreme and

graphic violence, including sexual assault, genocide, rape, and mutilation. Plaintiff Frazier views videos of the genocide in Myanmar, mass shootings, children being raped, and animals being mutilated. Content Moderators like Plaintiff Frazier spend twelve hours a day reviewing and moderating such videos to prevent disturbing content from reaching TikTok's users.

5.     Content Moderators also face repeated exposure to conspiracy theories (including suggestions that the COVID-19 pandemic is a fraud), distortions of historical facts (like denials that the Holocaust occurred), fringe beliefs, and political disinformation (like false information about participating in the census, lies about a political candidate's citizenship status or eligibility for public office, and manipulated or doctored videos of elected officials). This type of content has destabilized society and often features objectionable content.

6.      As a result of constant and unmitigated exposure to highly toxic and extremely disturbing images at the workplace, Ms. Frazier has developed and suffers from significant psychological trauma including anxiety, depression, and posttraumatic stress disorder ("PTSD").

7.     ByteDance and TikTok are aware of the negative psychological effects that viewing graphic and objectionable content has on Content Moderators. Despite this knowledge, they have not implemented safety standards known throughout the industry to protect their Content Moderators from harm.

8.     These safety standards could have reduced the risk and mitigated the harm suffered by Content Moderators working on behalf of ByteDance and TikTok.

9.     ByteDance and TikTok failed to implement workplace safety standards. Instead, they  requires their Content Moderators to work under conditions they know cause and exacerbate psychological trauma.

10.     By requiring their Content Moderators to review graphic and objectionable content, ByteDance and TikTok require Content Moderators to engage in abnormally dangerous activities. And by failing to implement the workplace safety standards they

helped develop, ByteDance and TikTok violates California law. By imposing non-disclosure agreements, ByteDance and TikTok exacerbate the harm they cause to Content Moderators.

11.     Without this Court's intervention, ByteDance and TikTok will continue to injure Content Moderators and breach the duties they owe to Content Moderators who review content on their platform.

12.     On behalf of herself and all others similarly situated, Plaintiff Frazier brings this action (1) to compensate Content Moderators that were exposed to graphic and objectionable content on ByteDance's TikTok platform; (2) to ensure that ByteDance and TikTok provide Content Moderators with tools, systems, and mandatory ongoing mental health support to mitigate the harm reviewing graphic and objectionable content can cause; and (3) to provide mental health screening and treatment to the thousands of current and former Content Moderators affected by ByteDance's and TikTok's unlawful practices.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) and 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class, including Plaintiff Frazier, are citizens of states different from some Defendants, and also because two Defendants are citizens or subjects of a foreign state.

14.     This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District, and purposely availed themselves of the laws of the

United States. TikTok is headquartered in the Los Angeles County and regularly conducts substantial business there including at its office in Culver City, California.

15.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. TikTok and ByteDance transacted business, maintained substantial contacts, or committed tortious acts in this District, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  TikTok is headquartered in the Los Angeles County and conducts substantial activities business there. Plaintiff Frazier and the proposed class have been, and continue to be, injured as a result of TikTok's and ByteDance's illegal conduct in the County of Los Angeles.

## PARTIES

16.     Plaintiff Frazier is a resident of Las Vegas, Nevada who works as a Content Moderator, reviewing content for ByteDance and TikTok. During this period, Plaintiff has been employed by Telus International.

17.     Defendant ByteDance Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California.

18.     Defendant TikTok Inc. ("TikTok") relevant times was, a California corporation with its principal place of business at 5800 Bristol Pkwy, Culver City, Los Angeles County, California. Defendant TikTok also maintains offices in Palo Alto, California and Mountain View, California. TikTok is owned by ByteDance. Defendants ByteDance Inc. and TikTok Inc. are referred to collectively as the "ByteDance Defendants."

19.     In doing the things alleged herein, each of the ByteDance Defendants was aware of and was aiding and abetting the actions of the other.

20.     Non-party Telus International ("Telus") is a dual listed public company trading on the New York Stock Exchange and Toronto Stock Exchange.  Non-party Telus International Holding (U.S.A.) Corp. is incorporated under the laws of Delaware with its headquarters located at 2251 South Decatur Boulevard Las Vegas, Nevada USA 89102. Telus International has several locations in the United States including in Las Vegas Nevada, Folsom, California, and North Charleston, South Carolina. Telus's Folsom branch is located at 255 Parkshore Drive, Folsom, California 95630. Defendants Telus International and Telus International Holding (U.S.A.) Corp. are referred to collectively as "Telus"

## FACTUAL ALLEGATIONS

**A. Content moderators watch and remove the most depraved images on the internet to protect ByteDance's profits.**

21.     Content moderation is the job of removing online material that is objectionable, offensive, or otherwise violates the terms of use for social networking sites like TikTok.

22.     In fiscal year 2020, ByteDance made approximately $34.3 billion in advertising revenue. In 2019, that number was $17 billion, and in 2018 that number was $7.4 billion. ByteDance accomplished this in part due to the popularity of its TikTok app. TikTok is a booming social media platform that allows posting of videos.

23.     TikTok is attractive to companies and individuals that want to buy advertisements because of its immense user base. TikTok has over 130 million active users. These users value TikTok for its plethora of content and ability to share information. Further, TikTok is immensely popular with younger demographics, a key group for advertising.

24.     According to a November 5, 2019 article in *The Washington Post*, "[t]he short-video app has become a global phenomenon and has taken young American audiences by storm, blending silly jokes, stunts and personal stories into a tech powerhouse downloaded more than 1.3 billion times worldwide."

25.     To generate this content, ByteDance relies on users to upload videos to its platform. TikTok users spend almost an hour on average a day on the app, with younger individuals spending even more time on the app.

26.     The amount of content on TikTok is massive, with TikTok having more than a billion videos viewed on its platform each day and millions of active users.

27.     Instead of scrutinizing content before it is uploaded, ByteDance and TikTok rely on users to report inappropriate content. ByteDance and TikTok receive millions of user reports of potentially objectionable content on its platforms. Human moderators review the reported content – sometimes thousands of videos and images every shift – and remove those that violate ByteDance's and TikTok's terms of use.

28.     Upon receiving a report from a user about inappropriate content, ByteDance and TikTok send that video to their Content Moderators. These videos include animal cruelty, torture, suicides, child abuse, murder, beheadings, and other graphic content.  The videos are each sent to two content moderators, who review the videos and determine if the video should remain on the platform, be removed from the platform, or have its audio muted.

29.     ByteDance and TikTok require Content Moderators to review hundreds of thousands if not millions of potentially rule-breaking posts per week via ByteDance's and TikTok's review software. Due to the sheer volume of content, content moderators are permitted no more than 25 seconds per video, and simultaneously view three to ten videos at the same time.

30.     Content moderators are constantly monitored by ByteDance and TikTok through their software. ByteDance's TCS software allows ByteDance and TikTok to watch and monitor Content Moderators. This functionality is used to supervise employees to ensure they remain on the platform at all times during work hours and strictly adhere to time breaks.

31.     ByteDance and TikTok recognize the dangers of exposing their users to images and videos of graphic violence. In December 2020, TikTok updated its

COMPLAINT AND DEMAND FOR JURY TRIAL

community guidelines, available at https://newsroom.tiktok.com/en-us/refreshing-our-policies-to-support-community-well-being, to foster well-being on its platform to address distressing content like suicide and self-harm.

32.　　In September 2020, Theo Bertram, TikTok's Director of Government Relations and Public Policy, told British politicians that TikTok has over 10,000 content moderators worldwide.

**B. Repeated exposure to graphic imagery can cause devastating psychological trauma, including PTSD, anxiety, and depression.**

33.　　It is well known that exposure to images of graphic violence can cause debilitating injuries, including PTSD, anxiety, and depression.

34.　　In a study conducted by the National Crime Squad in the United Kingdom, seventy-six percent of law enforcement officers surveyed reported feeling emotional distress in response to exposure to child abuse on the internet. The same study, which was co-sponsored by the United Kingdom's Association of Chief Police Officers, recommended that law enforcement agencies implement employee support programs to help officers manage the traumatic effects of exposure to child pornography.

35.　　In a study of 600 employees of the Department of Justice's Internet Crimes Against Children task force, the U.S. Marshals Service found that a quarter of the cybercrime investigators surveyed displayed symptoms of psychological trauma, including secondary traumatic stress.

36.　　Another study of cybercrime investigators from 2010 found that "greater exposure to disturbing media was related to higher levels of . . . secondary traumatic stress" and that "substantial percentages" of investigators exposed to disturbing media "reported poor psychological well-being."

37.　　The Eyewitness Media Hub has also studied the effects of viewing videos of graphic violence, including suicide bombing, and found that "40 percent of survey respondents said that viewing distressing eyewitness media has had a negative impact on their personal lives."

38.     Whereas viewing or hearing about another person's traumatic event used to be considered "secondary traumatic stress," the current Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 5th ed. 2013) ("DSM-5") recognizes that secondary or indirect exposure to trauma, such as repeated or extreme exposure to aversive details of trauma through work-related media, meets the first diagnostic criterion for PTSD.

39.     While there is no way to eliminate the risk created by exposure to graphic and objectionable content, especially demanding job requirements or a lack of social support reduce resilience in the face of trauma exposure and increase the risk of developing debilitating psychological symptoms.

40.     Depending on many factors, individuals who have experienced psychological trauma may develop a range of subtle to significant physical and psychological symptoms, including extreme fatigue, dissociation, difficulty sleeping, excessive weight gain, anxiety, nausea, and other digestive issues.

41.     Trauma exposure and PTSD are also associated with increased risk of chronic health problems including cardiovascular conditions, pain syndromes, diabetes, and dementia.

42.     There is growing evidence that early identification and treatment of PTSD is important from a physical health perspective, as a number of meta-analyses have shown increased risk of cardiovascular, metabolic, and musculoskeletal disorders among patients with long-term PTSD.

43.     Psychological trauma and PTSD are also often associated with the onset or worsening of substance use disorders. Epidemiologic studies indicate that one-third to one-half of individuals with PTSD also have a substance use disorder. Compared to individuals without PTSD, those with PTSD have been shown to be more than twice as likely to meet the diagnostic criteria for alcohol abuse or dependence; individuals with PTSD are also three to four times more likely to meet the diagnostic criteria for drug abuse or dependence.

44.     PTSD symptoms may manifest soon after the traumatic experiences, or they may manifest later, sometimes months or years after trauma exposure. The Americans with Disabilities Act recognizes that certain diseases can manifest into disabilities and describes PTSD as a "hidden disability" on its website: https://www.ada.gov/servicemembers_adainfo.html.

45.     An individual's risk of developing PTSD or associated symptoms may be reduced through prevention measures, categorized as primary, secondary, and tertiary interventions. Primary interventions are designed to increase resilience and lower the risk of future PTSD among the general population. Secondary interventions are designed to lower the risk of PTSD among individuals who have been exposed to trauma, even if they are not yet showing symptoms of traumatic stress. Finally, tertiary interventions are designed to prevent the worsening of symptoms and improve functioning in individuals who are already displaying symptoms of traumatic stress or who have been diagnosed with PTSD.

46.     Individuals who develop PTSD or other mental health conditions following traumatic exposure require not only preventative measures but also treatment. Unlike prevention, treatment measures are aimed at symptom resolution and recovery from the disorder.

47.     Preliminary screening is necessary to determine the types of prevention or treatment measures most appropriate for an individual.

**C. ByteDance and TikTok control the means and manner in which content moderation occurred.**

48.     ByteDance employs Telus to supply it with content moderators who work directly for Telus but at the direction and control of ByteDance. Plaintiff is one of the content moderators hired by Telus to perform content moderation work for the benefit of ByteDance.

49.     ByteDance and TikTok provide Telus and Content Moderators with ByteDance's proprietary review software (TCS) to moderate and tag videos and the tags Content Moderators are required to use on each video they view and moderate.

50.     ByteDance and TikTok use the TCS software not only as a platform for video review, but also to monitor the performance of Telus employees daily. ByteDance and TikTok use this software to monitor whether quotas are being met and to track the time Content Moderators spend away from the TCS application.



COMPLAINT AND DEMAND FOR JURY TRIAL



51.     ByteDance and TikTok cause Telus to withhold payment to Content Moderators if they are not on the TCS application beyond their allotted breaks (two fifteen-minute breaks and one hour-long lunch break for a twelve-hour workday), directly determining employee compensation.

52.     ByteDance and TikTok further send "adherence letters" or "adhesion contracts" to Content Moderators daily. Adherence contracts are standard form contracts or boilerplate contracts that are typically offered on a take it or leave it basis. Content Moderators were subject to weekly ByteDance and TikTok tests which provided videos for calibration for their software. Tags for videos were directly provided by ByteDance and TikTok to Content Moderators for use.

**D. ByteDance and TikTok do not meet industry standards for mitigating harm to Content Moderators.**

53.     ByteDance and TikTok are aware of the damage that disturbing imagery could have on Content Moderators. Through their app TikTok, ByteDance is a member of the Technology Coalition
created "to develop technology solutions to disrupt the ability to use the Internet to exploit children or distribute child pornography."

54.     Other members of the Technology Coalition include Facebook, YouTube, Snap Inc., and Google, all firms with similar content moderation challenges.

55.     In January 2015, the Technology Coalition published an "Employee Resilience Guidebook for Handling Child Sex Abuse Images" (the "Guidebook").

56.     According to the Guidebook, the technology industry "must support those employees who are the front line of this battle."

57.     The Guidebook recommends that internet companies implement a robust, formal "resilience" program to support Content Moderators' well-being and mitigate the effects of exposure to trauma-inducing imagery.

58.     With respect to hiring Content Moderators, the Guidebook recommends:

   a.   In an informational interview, "[u]se industry terms like 'child sexual abuse imagery' and 'online child sexual exploitation' to describe subject matter";

   b.   In an informational interview, "[e]ncourage candidate to go to websites [like the National Center for Missing and Exploited Children] to learn about the problem";

   c.   In follow-up interviews, "[d]iscuss candidate's previous experience/knowledge with this type of content";

   d.   In follow-up interviews, "[d]iscuss candidate's current level of comfort after learning more about the subject";

e.  In follow-up interviews, "[a]llow candidate to talk with employees who handle content about their experience, coping methods, etc."; and

f.  In follow-up interviews, "[b]e sure to discuss any voluntary and/or mandatory counseling programs that will be provided if candidate is hired."

59.  With respect to safety on the job, the Guidebook recommends:

a.  Limiting the amount of time an employee is exposed to child sexual abuse imagery;

b.  Teaching moderators how to assess their own reaction to the images;

c.  Performing a controlled content exposure during the first week of employment with a seasoned team member and providing follow up counseling sessions to the new employee;

d.  Providing mandatory group and individual counseling sessions administered by a professional with specialized training in trauma intervention; and

e.  Permitting moderators to "opt-out" from viewing child sexual abuse imagery

60.  The Technology Coalition also recommends the following practices for minimizing exposure to graphic content:

a.  Limiting time spent viewing disturbing media to "no more than four consecutive hours";

b.  "Encouraging switching to other projects, which will allow professionals to get relief from viewing images and come back recharged and refreshed";

c.  Using "industry-shared hashes to more easily detect and report [content] and in turn, limit employee exposure to these images. Hash technology allows for identification of exactly the same image previously seen and identified as objectionable";

d.  Prohibiting Content Moderators from viewing child pornography one hour before the individuals leave work; and

e.  Permitting Content Moderators to take time off as a response to trauma.

61.     According to the Technology Coalition, if a company contracts with a third-party vendor to perform duties that may bring vendor employees in contact with graphic content, the company should clearly outline procedures to limit unnecessary exposure and should perform an initial audit of the independent contractor's wellness procedures for its employees.

62.     The National Center for Missing and Exploited Children ("NCMEC") also promulgates guidelines for protecting Content Moderators from psychological trauma. For instance, NCMEC recommends changing the color or resolution of the image, superimposing a grid over the image, changing the direction of the image, blurring portions of the image, reducing the size of the image, and muting audio.

63.     Based on these industry standards, some internet companies take steps to minimize harm to Content Moderators. For instance, at Microsoft, "[t]he photos are blurred, rendered in black and white, and shown only in thumbnail sizes. Audio is removed from video." Filtering technology is used to distort images, and Content Moderators are provided with mandatory psychological counseling.

64.     At the UK's Internet Watch Foundation, each applicant for a content moderator position is assessed for suitability by a psychologist, who asks about their support network, childhood experiences, and triggers. Applicants are then interviewed about their work skills before proceeding to a final interview where they are exposed to child sexual abuse imagery. Candidates sit with two current Content Moderators and review a sequence of images getting progressively worse, working towards the worst kinds of sexual violence against children. This stage is designed to see how candidates cope and let them decide whether they wish to continue with the application process. Once they accept the job, Content Moderators have an enhanced background check

before they start their six months' training, which involves understanding criminal law, learning about the dark web, and, crucially, building relevant trauma resilience.

### E. ByteDance and TikTok fail to implement meaningful protections for their Content Moderators.

65. ByteDance and TikTok fail to implement workplace safety measures that meet industry standards that other companies and non-profits have implemented. ByteDance and TikTok have further failed to implement the standards suggested by the Technology Coalition, despite being a member.

66. ByteDance and TikTok do not ensure that Content Moderators are asked about their previous experience with graphic content, nor do they make sure that they are told that this content can have a significant negative mental health impact on content moderators. Content moderators are not permitted to preview the graphic content or advised to seek out other outside information during the hiring process.

67. Before Content Moderators are exposed to any graphic content or receive any training, they are required to sign an employment contract and Non-Disclosure Agreement ("NDA"). Only after these documents are signed does the training begin.

68. ByteDance and TikTok do not require that Content Moderators be trained about how to address their own reaction to the images.

69. ByteDance and TikTok fail to provide safeguards known to mitigate the negative effects of reviewing graphic content.

70. Content Moderators are required to review hundreds of graphic and disturbing videos each week. To determine whether a video should be removed, ByteDance and TikTok create and continually revise tags for content that Content Moderators must use to determine whether flagged content violates ByteDance's and TikTok's policies. Lately, TikTok has increased the number of "tags" Content Moderators must use while moderating videos from 20 tags to 100 tags. Content Moderators are now expected not to just to review the content of the video, but review

video backgrounds and other aspects of the video to make sure they conform to TikTok's rules.

71. Despite these complex Community Guidelines, ByteDance and TikTok impose strict quantity and accuracy quotas on Content Moderators. Content Moderators are required to review videos for no longer than 25 seconds. Within the 25 permitted seconds of reviewing each video, Content Moderators are expected to have an accuracy rate of 80%. Content Moderators review between 3 to 10 videos at the same time. Despite this, they are continuously surveilled and pushed by the TCS software to review videos faster and faster.

72. To determine whether Content Moderators meet these metrics, ByteDance and TikTok audit Content Moderator's work through software that constantly monitors the Content Moderators, including ByteDance's TCS software and Vigilant, a program available from the Google Store.

73. ByteDance and TikTok were aware or should have been aware that their strict standards created stress and that such stress contributed to and exacerbated Content Moderators' risks of developing psychological trauma.

74. For many reasons—including low wages, short-term contracts, and the trauma associated with the work—many Content Moderators remain in their positions for less than one year.

75. Because of this high turnover and due to the immense amount of content that requires manual review, Content Moderators are consistently overworked. Content Moderators are required to work long hours—an average of 12 hours a day—reviewing graphic content, despite industry standards that posit that Content Moderators should be limited to reviewing four hours of graphic content per day. In fact, Content Moderators at Telus routinely spend more than four hours a day reviewing graphic content, with only one 15-minute break in between 4-hour periods of review.

76. ByteDance and TikTok monitor and are aware of the content of the videos the Content Moderators view, the number of videos the Content Moderators view per

hour and per day, and the length of continuous content moderation sessions and breaks. ByteDance and TikTok control how the videos are displayed (e.g., full screen versus thumbnails, blurred versus unblurred, etc.), how the accompanying audio is broadcasted, and whether videos begin automatically upon completion of the prior video or whether the Content Moderator can catch his or her breath by controlling the start of the ensuing video. All of this is done through the TCS software that Telus is required to use.

77.     Despite its awareness of the impact of reviewing graphic content, ByteDance and TikTok knowingly failed to implement industry-recognized standards to mitigate harm to Content Moderators. ByteDance and TikTok could have, but failed to, implement safeguards on their Content Moderation tools—including changing the color or resolution of the video, superimposing a grid over the video, changing the direction of the video, blurring portions of the video, reducing the size of the video, and muting audio—that could mitigate some of the harm caused by reviewing graphic and disturbing content.

78.     This failure is especially glaring considering the reasonably uncomplicated nature of many of the tool-related changes. ByteDance has full control over their TCS software, which presents the videos to the Content Moderators.  Allowing for blurring of images and videos and providing tags for ultra-graphic violence would take little time to implement and could provide significant benefits to the health and safety of Content Moderators.

79.     ByteDance and TikTok also fail to provide psychological support to Content Moderators. ByteDance and TikTok purportedly offer Content Moderators "wellness" benefits, including specified wellness time. However, ByteDance's and TikTok's public claims about industry leading "wellness benefits" ring hollow as Defendants repeatedly reduced wellness time from one hour a week to thirty minutes a week.

80.     Content Moderators were further punished for any time away from the TCS application, making it almost impossible for them to utilize the meager wellness

protections available unless they did so before or after their 12-hour workday. Without any meaningful counseling or similar mental support, Plaintiff and other Content Moderators were ill equipped to handle the mentally devastating imagery their work required them to view.

81.     ByteDance and TikTok heavily punishes any time taken away from watching graphic videos. Content Moderators are provided only 15 minutes within the first 4 hours of watching graphic content and afterwards 15 minutes every two hours, significantly less than the Technology Coalition's guidance of not allowing viewing of graphic content for longer than 4 consecutive hours.

**F.  ByteDance and TikTok know that exposure to graphic content can cause psychological trauma but have not taken adequate precautions.**

82.     Telus, directed by ByteDance, hires the Content Moderators for the TikTok application.

83.     In addition to failing to provide any wellness help, ByteDance and TikTok have continuously increased the workload on Content Moderators by increasing the number of tags attributed to videos and increasing the specificity of review. This has been further coupled by increasing monitoring to force Content Moderators to adhere to the minimal break schedule provided.

84.     If a Content Moderator is fired or quits, they lose medical insurance and other healthcare benefits, as well as their income. Therefore, Content Moderators were left with a terrible choice—quit and lose access to an income and medical insurance or continue to suffer in silence to keep their job.

85.     From approximately January 16, 2018 to the present Candie Frazier has worked as first-level Content Moderator.

86.     During this period, Plaintiff was employed solely by Telus International. Plaintiff has never been employed by ByteDance or TikTok in any capacity.

87.     At all times relevant to this complaint, ByteDance was a client of Telus International.

88.     Telus International directly oversaw all human resources matters concerning Plaintiff.

89.     During her employment as a Content Moderator, Plaintiff was exposed to thousands of graphic and objectionable videos, including graphic violence, sexual assault, and child pornography. For example, Plaintiff witnessed videos of: a smashed open skull with people eating from it; a woman who was kidnapped and beheaded by a cartel; a person's head being run over by a tank; a man eating the head off a rat; a fox being skinned alive; a man falling to his death off a roof that included audio of the impact of his body hitting the ground; school shootings included dead bodies of children; a politician shooting himself; backyard abortions; child abuse; and child sexual assault.

90.     As a result of training for and providing content moderation services for TikTok, Plaintiff developed severe psychological trauma including depression and symptoms associated with anxiety and PTSD.

91.     PTSD and related syndromes caused by exposure to harmful content can be triggered by witnessing abuse; watching the news or seeing violence on television; hearing loud noises like gunshots, fireworks, cars backfiring, or objects falling; seeing terrorist groups or paraphernalia; and seeing racially-discordant posts sowing political dissension in America. Plaintiff has trouble sleeping and when she does sleep, she has horrific nightmares. She often lays awake at night trying to go to sleep, replaying videos that she has seen in her mind. She has severe and debilitating panic attacks. She has lost many friends because of her anxiety around people. She has trouble interacting and being around kids and is now scared to have children.

## CLASS ACTION ALLEGATIONS

92.     Plaintiff Frazier brings this class action on behalf of herself, and all others similarly situated pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

All individuals in the United States that performed content moderation work for or in relation to ByteDance's TikTok application at any time until the present.

93.     The Class definition specifically excludes the following persons or entities:

    a.  any of the Defendants named herein;

    b.  any of Defendants' parent companies, subsidiaries, and affiliates;

    c.  any of Defendants' officers, directors, management, employees, or agents;

    d.  all governmental entities; and

    e.  the judges and chambers staff in this case, as well as any members of their immediate families.

    f.  any Content Moderators that are employed directly by Defendant.

94.     The class is so numerous that joinder of all members is impracticable. Plaintiff does not know the exact size of the class since that information is within the control of ByteDance and its vendors. However, upon information and belief, Plaintiff alleges that the number of class members is in the thousands. Membership in the class is readily ascertainable from ByteDance's records such as those relating to its contracts with Telus, ByteDance's Vendors or users of TikTok' s TCS software.

95.     The claims asserted by Plaintiff are typical of the proposed class's claims in that the representative plaintiff, like all class members, was exposed to highly toxic, unsafe, and injurious content while providing content moderation services for ByteDance and TikTok. Each member of the proposed class has been similarly injured by ByteDance's and TikTok's misconduct.

96.     There are numerous questions of law or fact common to the class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

    a.  whether ByteDance and TikTok committed the violations of the law alleged herein;

b. whether viewing graphic and objectionable conduct in the manner which Content Moderators do for ByteDance and TikTok is an abnormally dangerous activity;

c. whether ByteDance and TikTok participated in and perpetrated the tortious conduct complained of herein;

d. whether Plaintiff and the class are entitled to medical screening, treatment, and damages; and

e. whether ByteDance and TikTok should be ordered to implement and comply with proper guidelines for safety in content moderation.

97. Plaintiff will fairly and adequately represent the proposed class and protect the interests of the proposed class. Plaintiff has retained attorneys experienced in class actions, complex litigation, California law, and issues involving content moderation. Plaintiff intends to vigorously prosecute this litigation. Neither Plaintiff Frazier nor her counsel have interests that conflict with the interests of other class members.

98. Plaintiff Frazier and the proposed class members have all suffered and continue to suffer ongoing harm resulting from ByteDance's and TikTok's wrongful conduct.

99. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This action likely presents no difficulties in management that would preclude maintenance as a class action.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Abnormally Dangerous Activity against all defendants)

100.    Plaintiff realleges and incorporates by reference herein all allegations above.

101.    A company is strictly liable to individuals that are injured while the company engages in an abnormally dangerous activity.

102.    An activity is abnormally dangerous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage.

103.    Requiring Content Moderators to review graphic and objectionable content is an abnormally dangerous activity. Content Moderators risk serious and debilitating psychological trauma, including severe anxiety, depression and PTSD and there is no way to eliminate this risk. Content moderation is also not a matter of common usage. Only a handful of technology companies, non-profits, government agencies, and non-governmental organizations review content.

104.    Strict liability for a defendant that engages in abnormally dangerous activity represents a social-policy determination that the defendant, while engaged in an enterprise tolerated by the law, must pay for the damage caused by its enterprise.

105.    In fiscal year 2020, ByteDance made a combined approximately $1.9 billion in revenue from TikTok. TikTok is among, if not the, fastest growing app of 2020, with its market share continuing to increase at a rapid pace.

106.    ByteDance and TikTok derive this vast wealth from providing a platform safe from graphic and objectionable content. ByteDance and TikTok rely on Content Moderators to ensure that the platform is free from graphic and objectionable content. ByteDance and TikTok monitor and control Content Moderators day-to-day work and provide the software that allows Content Moderators to do their jobs. Therefore,

ByteDance and TikTok are required under the law to pay for the harm caused by requiring Content Moderators to review and remove graphic and objectionable content.

107.    As a result of ByteDance's and TikTok's tortious conduct, Plaintiff and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, anxiety, and depression.

108.    To remedy that injury, Plaintiff and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

109.    The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to preventing or mitigating various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

110.    In particular, the medical monitoring regime includes (a) secondary preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) tertiary interventions, designed to reduce the worsening of symptoms among those who are already experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

111.    Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiff and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiff and the class have incurred as a result of ByteDance's and TikTok's unlawful conduct.

112.    Plaintiff seeks medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety, and depression.

113. Plaintiff also seeks compensatory damages for the injuries she and the class have suffered.

114. Plaintiff also seeks an award of attorney's fees.

## SECOND CAUSE OF ACTION
### NEGLIGENCE
**(Negligent Exercise of Retained Control against all Defendants)**

115. Plaintiff realleges and incorporates by reference herein all allegations above.

116. Solely in the alternative and to the extent it is determined that ByteDance and TikTok is not strictly liable for the harm caused by engaging in an abnormally dangerous activity, Plaintiff brings this second cause of action for negligent exercise of retained control.

117. The hirer of an independent contractor is liable to an employee of the contractor insofar as the hirer's negligent exercise of retained control affirmatively contributed to the employee's injuries.

118. If an entity hires an independent contractor to complete work but retains control over any part of the work, the hiring entity has a duty to the independent contractor's employees or subcontractors to exercise that control with reasonable care.

119. If the hiring entity negligently exercises its retained control in a manner that affirmatively contributes to the injuries of the contractor's employees or subcontractors, the hiring entity is liable for those injuries.

120. At all times relevant to the allegations herein, Plaintiff and class members were employees or subcontractors of independent contractors that ByteDance and TikTok hired to provide content moderation services including, for example, Telus International.

121. ByteDance and TikTok exercised retained control over certain aspects of the work performed by Plaintiff and the class, including:

Civil Action No. 2:21-cv-9913

24

COMPLAINT AND DEMAND FOR JURY TRIAL

a. Requiring Content Moderators to use a ByteDance-developed review platform that presented unmitigated traumatic content to Content Moderators according to ByteDance's-developed algorithms;

b. Requiring that Content Moderators—through their employers—sign NDAs and undergo ByteDance and TikTok-developed confidentiality trainings that prohibited Content Moderators from discussing their work outside their review teams;

c. Required that Content Moderators be monitored throughout their work by ByteDance and TikTok;

d. Required that Content Moderators be sent daily adherence letters and weekly ByteDance and TikTok calibration tests;

e. Requiring that Content Moderators be interviewed and undergo training using ByteDance- and TikTok-developed training materials and procedures; and

f. Setting expectations as to the overall timeframe for and accuracy of content review, calculating the amount of time it should take a Content Moderator to review different types of posts, and deciding the overall number of hours required to meet the overarching timeframe and accuracy expectations.

122. Based on its exercise of retained control, ByteDance and TikTok have had at all relevant times a duty to exercise reasonable care with regard to the safety of Plaintiff and the class.

123. ByteDance and TikTok negligently exercised their retained control in a manner that affirmatively contributed to the injuries of Plaintiff and the class, including by exacerbating Plaintiff's and class members' risks of developing PTSD or other health issues. For example:

a. ByteDance and TikTok failed to provide adequate technological safeguards to protect Content Moderators from risks associated with exposure to traumatic content via their TCS software.

b. ByteDance's and TikTok's NDAs and confidentiality requirements diminished Content Moderators' social support networks and resilience by prohibiting Content Moderators from speaking about the content they reviewed or other related workplace conditions to anyone outside of their review teams;

c. ByteDance and TikTok failed to provide Content Moderators with an interview process and training that met industry standards for the mental health of Content Moderators; and

d. By setting demanding standards for review, both in terms of quantity and quality expectations, ByteDance and TikTok imposed stressful work conditions that served to further reduce Content Moderators' resilience to trauma.

124.   ByteDance and TikTok were aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence.

125.   ByteDance and TikTok were also aware or should have been aware that the review technology could be made safer if proper precautions were followed, that requiring Content Moderators not to discuss their work or workplace conditions reduced their ability to deal with traumatic content, and that ByteDance's and TikTok's overall quality and quantity standards had the effect of imposing intense workplace stress and, accordingly, increasing Content Moderators' risk of injury from psychological trauma.

126.   ByteDance and TikTok breached their duty to Plaintiff and the class by failing to provide the necessary and adequate technological safeguards, safety and instructional materials, warnings, social support, and other means to reduce and/or

minimize the physical and psychiatric risks associated with exposure to graphic imagery through TCS.

127.    ByteDance and TikTok continue to breach their duty to class members by failing to exercise their retained control with reasonable care; that breach continues to elevate class members' risk of injury from psychological trauma.

128.    As a result of ByteDance's and TikTok's tortious conduct, Plaintiff and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, anxiety, and depression.

129.    To remedy that injury, Plaintiff and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

130.    The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to preventing or mitigating various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

131.    In particular, the medical monitoring regime includes (a) secondary preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) tertiary interventions, designed to reduce the worsening of symptoms among those who are already experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

132.    Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiffs and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiff and the class has incurred as a result of ByteDance's unlawful conduct.

133.    Plaintiff seeks medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety, and depression.

134.    Plaintiff also seeks compensatory damages for the injuries she and the class have suffered.

135.    Plaintiff also seeks an award of attorney's fees.

## THIRD CAUSE OF ACTION
### NEGLIGENCE
### (Negligent Provision of Unsafe Equipment against all Defendants)

136.    Plaintiff realleges and incorporate by reference herein all allegations above.

137.    Solely in the alternative and to the extent that this Court concludes that ByteDance and TikTok are not strictly liable for the harm caused by engaging in an abnormally dangerous activity, Plaintiff brings this third cause of action for negligence provision of unsafe equipment.

138.    An entity that hires an independent contractor to complete work is liable to the independent contractor's employees or subcontractors if the hiring entity negligently provides unsafe equipment that contributes to a workplace injury.

139.    ByteDance and TikTok provided to their independent contractors the review platform that Plaintiff and the class were required to use to complete their work.

140.    ByteDance and TikTok had a duty to exercise reasonable care to furnish a safe review platform to their contractors.

141.    ByteDance and TikTok were aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence through its review platforms.

142.    ByteDance and TikTok were aware or should have been aware that their review platforms could be made safer if proper precautions were followed.

143.    ByteDance and TikTok nevertheless provided unsafe review tools to Plaintiff and the class that exposed Plaintiff and the class to unmitigated traumatic content.

144.    ByteDance and TikTok breached their duty to Plaintiff and the class by failing to provide necessary and adequate technological safeguards, safety and instructional materials, warnings, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through ByteDance's review platform.

145.    ByteDance and TikTok continue to breach its duty to class members by failing to provide a reasonably safe review platform; that breach continues to elevate class members' risk of injury from psychological trauma.

146.    As a result of ByteDance's and TikTok's tortious conduct, Plaintiff and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, anxiety, and depression.

147.    To remedy that injury, Plaintiff and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

148.    The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to preventing or mitigating various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

149.    In particular, the medical monitoring regime includes (a) secondary preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) tertiary interventions, designed to reduce the worsening of symptoms among those who are already experiencing symptoms associated with post-traumatic stress or have a diagnosis of

PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

150.    Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiff and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiff and the class have incurred as a result of ByteDance's and TikTok's unlawful conduct.

151.    Plaintiff seeks medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety, and depression.

152.    Plaintiff also seeks compensatory damages for the injuries she and the class have suffered.

153.    Plaintiff also seeks an award of attorney's fees.

### FOURTH CAUSE OF ACTION
### CALIFORNIA UNFAIR COMPETITION LAW
### (against all Defendants)

154.    Plaintiff realleges and incorporates by reference herein all allegations above.

155.    Solely in the alternative and to the extent that this Court concludes that ByteDance and TikTok are not strictly liable for the harm caused by engaging in an abnormally dangerous activity, Plaintiff brings this fourth cause of action for violation of California Unfair Competition Law.

156.    ByteDance's and TikTok's negligent exercise of retained control of the content moderation work performed by Plaintiff and the class violates California common law.

157.    ByteDance's and TikTok's negligent provision of unsafe equipment and software to their independent contractors for use by Plaintiff and the class also violates California common law.

158.    Plaintiff suffered an injury in fact because of ByteDance's and TikTok's negligent conduct and has lost money because of ByteDance's and TikTok's conduct.

159.    Specifically, Plaintiff paid out of pocket for medical treatment and therapy for her depression and symptoms of anxiety and PTSD, which was caused by ByteDance's and TikTok's conduct.

160.    There were and are reasonably available alternatives to the conduct described herein that would further ByteDance's and TikTok's legitimate business interests.

161.    Plaintiff seeks all appropriate injunctive relief pursuant to section 17203 of the California Business and Professions Code, including an order requiring ByteDance and TikTok to implement safety guidelines for all prospective content moderation operations.

162.    Plaintiff also seek an injunction creating a ByteDance- and TikTok-funded medical monitoring program to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including preventing or mitigating conditions such as PTSD, anxiety, and depression. The program should include a fund to pay for the medical monitoring and treatment of Plaintiff and the class as frequently and appropriately as necessary.

163.    Plaintiff also seeks an award of attorney's fees.

## FIFTH CAUSE OF ACTION
### CALIFORNIA UNFAIR COMPETITION LAW
### (against all Defendants as a "Special Employer")

164.    Plaintiff realleges and incorporate by reference herein all allegations above.

165.    Solely in the alternative and to the extent that this Court concludes that ByteDance and TikTok are a "special employer" of Plaintiff and the class, Plaintiff brings this fifth cause of action under the UCL based on ByteDance's failure to provide a safe workplace and its violation of California's prohibition on non-disclosure requirements concerning workplace conditions.

166. Section 6400 of California's Labor Code requires employers to "furnish employment and a place of employment that is safe and healthful for the employees therein." Similarly, section 6401 requires every employer to "furnish and use safety devices and safeguards, and [to] adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful."

167. To protect employees from unsafe workplaces, California law requires that "[e]very employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees." Cal. Labor Code § 6401. This includes "establish[ing], implement[ing], and maintain[ing] an effective injury prevention program." Cal. Labor Code § 6401.7. Employers must "provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe," "adopt and use methods and processes reasonably adequate to render the employment and place of employment safe," and "do every other thing reasonably necessary to protect the life, safety, and health of employees." Cal. Labor Code § 6403

168. No employer can "require or permit any employee to go or be in any employment or place of employment which is not safe and healthful." Cal. Labor Code § 6402.

169. ByteDance and TikTok failed to provide a safe working environment. ByteDance and TikTok routinely and repeatedly exposed Plaintiff and the class to content known to cause psychological trauma, including PTSD, anxiety, and depression. Even though ByteDance and TikTok knew of and could have reasonably implemented adequate safety measures, the corporation refused to implement necessary and adequate safety and instructional materials, trainings, warnings, and means to reduce and/or minimize the risks associated with exposure to graphic content.

170. ByteDance and TikTok's failure to provide a safe workplace for Plaintiff and the class violates, *inter alia*, sections 6400, 6401, 6401.7, 6402, and 6403 of the California Labor Code.

171.    In requiring Content Moderators to sign sweeping NDAs and instructing Content Moderators not to disclose information about working conditions—including the traumatic nature of the content, the intense stress from quantity and quality expectations, and the lack of training and safety measures to protect moderators from trauma exposure—ByteDance and TikTok further violate section 232.5 of the California Labor Code.

172.    ByteDance's and TikTok's illegal conduct was and is willful and serious and has directly caused harm to Plaintiff and the class.

173.    Plaintiff suffered an injury in fact because of ByteDance's and TikTok's conduct and has lost money because of ByteDance's and TikTok's conduct.

174.    Specifically, Plaintiff paid out of pocket for medical treatment and therapy for her depression and symptoms of anxiety and PTSD, which was caused by ByteDance's and TikTok's conduct.

175.    There were reasonably available alternatives to the conduct described herein that would further ByteDance's and TikTok's legitimate business interests

176.    ByteDance's and TikTok's failure to follow worker safety laws amounts to an unlawful, unfair, and fraudulent business practice under California Business and Professions Code Section 17200.

177.    Plaintiff seeks all appropriate injunctive relief pursuant to Business and Professions Code section 17203, including an order requiring ByteDance and TikTok to implement safety guidelines for all Content Moderators.

178.    Plaintiff also seeks an injunction creating a ByteDance- and TikTok-funded medical monitoring program to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including preventing or mitigating conditions such as PTSD, anxiety, and depression. The program should include a fund to pay for the medical monitoring and treatment of Plaintiff and the class as frequently and appropriately as necessary.

179.    Plaintiff and the class will be irreparably harmed and/or denied an effective

1   and complete remedy if such an order is not granted.

2       180.   Plaintiff also seeks an award of attorney's fees.

3   **PRAYER FOR RELIEF**

4       **WHEREFORE**, Plaintiff, individually and on behalf of the class, requests that

5   the Court:

6       a.  Certify this action as a class action with a class as defined above;

7       b.  Find that Plaintiff is a proper representative of the class and appoint the

8           undersigned as class counsel;

9       c.  Order Defendants to pay to notify class members of the pendency of this suit;

10      d.  Order Defendants to create a medical monitoring fund for the benefit of

11          Plaintiff and the class;

12      e.  Order Defendants to pay compensatory damages to Plaintiff and the class;

13      f.  Award injunctive relief as is necessary to protect the interests of Plaintiff and

14          class members, including by enjoining Defendants from continuing to conduct

15          business through the unlawful and unfair practices alleged herein, ordering

16          Defendants to implement safety guidelines for all prospective content

17          moderation operations, and ordering Defendants to establish a fund to pay for a

18          medical monitoring program to facilitate the ongoing screening, diagnosis, and

19          adequate treatment of Plaintiff and the class for psychological trauma—

20          including to prevent or mitigate conditions such as PTSD, anxiety and

21          depression—until it can be determined that psychological trauma is no longer a

22          threat to their health;

23      g.  Award Plaintiff and class members their reasonable litigation expenses and

24          attorneys' fees; and

25      h.  Award any further relief that this Court deems just and equitable.

26  **<u>DEMAND FOR JURY TRIAL</u>**

27      Plaintiff hereby requests trial by jury.

28

Civil Action No. 2:21-cv-9913

34

1 Dated: December 23, 2021

2

Respectfully Submitted,

JOSEPH SAVERI LAW FIRM, LLP

By: _____

Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Anupama K. Reddy (SBN 324873)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           swillliams@saverilawfirm.com
           areddy@saverilawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28